IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 23, 2014

**TRACY LYNN COPE v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Sullivan County**
**No. C62240    Robert H. Montgomery, Judge**

———————

**No. E2013-02590-CCA-R3-ECN - Filed August 21, 2014**

———————

In 2007, a Sullivan County jury convicted the Petitioner, Tracy Lynn Cope, of especially aggravated kidnapping, aggravated kidnapping, and false imprisonment, and the trial court sentenced him to an effective sentence of forty years. *State v. Tracy Lynn Cope*, No. E2009-00435-CCA-R3-CD, 2010 WL 2025469 (Tenn. Crim. App., at Knoxville, May 20, 2010), *perm. app. denied* (Tenn. Sept. 22, 2010). After the Petitioner filed two petitions for post-conviction relief, both of which were denied, he filed a petition for a writ of error coram nobis, which the trial court summarily dismissed. On appeal, the Petitioner contends that the lower court erred when it dismissed his petition. After a thorough review of the record and applicable authorities, we affirm the coram nobis court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., J., and JOE E. WALKER, III, SP. J., joined.

Tracy Lynn Cope, Henning, Tennessee, Pro Se.

Robert E. Cooper, Jr., Attorney General and Reporter; Ahmed A. Safeeullah, Assistant Attorney General; and Barry P. Staubus, District Attorney General, for the Appellee, State of Tennessee.

**OPINION**
**I. Facts**
**A. Background and Direct Appeal**

In our opinion in the Petitioner's direct appeal of his conviction, we summarized the facts presented at trial as follows:

The [Petitioner] in this case was convicted of kidnapping Amanda Wilson and Debbie Callahan. The victim, who was the [Petitioner]'s girlfriend, arrived home to find him engaged in sexual relations with a third woman, Jakia Ford. The victim told the [Petitioner] to gather his things and leave. She recalled that the [Petitioner] became angry and started to scream and yell. She testified that he had been smoking cocaine and had not slept in three days. He repeatedly said that there was someone in the apartment and that the women were trying to kill him. She said he picked up the box springs and opened the closet doors. She said that both women attempted to leave the apartment, but the [Petitioner] would not allow them to leave. He said he was going to "get" them before they got him.

The [Petitioner] forced both women into Wilson's van. He held Ms. Ford by the waist and Wilson by her shirt. Wilson said they did not resist or try to run away because she knew what the [Petitioner] could do. She testified that she was afraid because she knew she could not run away from the [Petitioner]. Once inside the van, the [Petitioner] locked the doors and drove through downtown Kingsport. Wilson testified that the [Petitioner] did not speak to the women, but he talked to himself. He said, "Damn, Tracy, look[ ] what you've done. You just need to take them out to the country and tie them up to a tree." He drove them to a public housing apartment complex in Kingsport where he forced them into an apartment. He told the man in the apartment that he had "taken" the women and that they needed to "pay the price" for trying to kill him. The [Petitioner] then forced the women back out to the van. Although the [Petitioner] stopped the van later and allowed Ms. Ford to leave, the victim testified that Ms. Ford appeared to be afraid the entire time.

The [Petitioner] then drove to another apartment complex and forced Wilson out of the van. He knocked on a door where Debbie Callahan, the second victim, answered. The [Petitioner] grabbed both women and made them sit on the floor. He accused them of trying to kill him. Wilson thought he was even angrier and more agitated than when she first saw him in their apartment earlier that evening.

The [Petitioner] forced Wilson to remove her clothes, and he was holding both women until Wilson tried to resist. At that point, Ms. Callahan was able to escape and ran out the front door. The police were called during the struggle, and Wilson could see a uniformed officer and his car outside the apartment door. The [Petitioner] screamed that the officer was not really the

police. The [Petitioner] put Wilson in a choke hold from behind. He eventually walked out of the apartment but continued to hold Wilson by her throat. The [Petitioner] held her between him and the officer. He eventually let go of Wilson and lay on the ground as instructed by the officers.

Ms. Callahan, the second victim, testified that she lived in an apartment in Sullivan County and that she had met the [Petitioner] one day when they smoked crack in her apartment. She recalled that the [Petitioner] knocked on her door in the early morning hours of August 29, 2005. The [Petitioner] asked her if she wanted to buy some crack, but she told him she had no money. He asked to come in anyway, and they started to smoke some crack. She recalled that the [Petitioner] began to act strangely and became rough and mean toward her. He began grabbing at her in an attempt to have sex with her. She said he also wanted her to have sex with his girlfriend who was in the car.

Callahan went to the door and screamed for Wilson to come inside because the [Petitioner] was getting out of control. The [Petitioner] removed Wilson's clothes and also attempted to remove Callahan's clothes. She said that he grabbed her by her hair, shirt, and pants, but she did not want him to touch her. He told her that, if she tried to set him up, he would fix her so nobody would ever look at her again. She testified that she was afraid then and was still afraid at trial. She said that when she freed herself, she ran from the apartment and hid under a tree for a couple of hours.

Officer Jason McClain testified that he was a patrolman with the Kingsport Police Department when he was dispatched to Callahan's apartment. He arrived around 4:45 a.m. to find the [Petitioner] and Callahan inside the apartment. The door was open, and he heard a man's voice yelling, "Call 911, call 911, I want police here now, call 911." He looked inside and saw the [Petitioner] screaming as he held Callahan in a choke hold. She was crying, shaking, and appeared to be very frightened. The officer identified himself as the police and asked, "What's going on here, I am the police."

The officer testified that he could see something on or in the [Petitioner]'s hand, which he was holding behind Callahan. It turned out to be a cast on the [Petitioner]'s hand but, at the time, the officer was unable to determine if it was a weapon. The officer testified that he took cover behind the doorframe, called for backup, and waited for additional officers. The [Petitioner] continued to hold Callahan in a choke hold. When backup officers arrived, they ordered the [Petitioner] to come out of the apartment. The

[Petitioner] still had Callahan in a choke hold when he came outside and held her body between himself and the officers. He released her when the officers ordered him to the ground.

The officer testified that four to five minutes elapsed between his arrival until the [Petitioner] was on the ground outside the apartment. He estimated that the [Petitioner] held Callahan "just a minute" at the door to the apartment. The officer did not have his weapon drawn when he first saw the [Petitioner] through the apartment door, but his weapon was drawn when the [Petitioner] exited the apartment.

*Cope*, 2010 WL 2025469 , at *1-3.

Based upon this evidence, the jury convicted the Petitioner of especially aggravated kidnapping, aggravated kidnapping, and false imprisonment, and the trial court sentenced him to an effective sentence of forty years.

## B. Post-Conviction Filings

The Petitioner filed his first petition for post-conviction relief on April 11, 2011. He alleged that his trial counsel was ineffective for failing to discuss with him admissible impeachment evidence, failing to explain to him the maximum possible punishment he faced, failing to call an eyewitness to testify at trial, and failing to properly cross-examine two witnesses. *Tracy L. Cope v. State*, E2011-01198-CCA-R3-PC (Tenn. Crim. App., at Knoxville, Sept. 11, 2012), *perm. app. denied* (Feb. 22, 2013).[1] The post-conviction court summarily dismissed this petition, and this Court affirmed that decision.

On February 7, 2013, the Petitioner filed a motion for consideration of post-judgment facts in the Tennessee Supreme Court pursuant to Rules 14 and 22 of the Tennessee Rules of Appellate Procedure. In this motion, he asserted that the State had not disclosed that a material witness, Ms. Callahan, was working for the State as a confidential informant in another case. He asked the trial court to reconsider his case in light of these facts. The Supreme Court denied the Petitioner's request for a rehearing.

The Petitioner filed a second petition for post-conviction relief on March 15, 2013, which the post-conviction court again summarily dismissed. This Court again affirmed the post-conviction court's judgment. *Tracy L. Cope v. State*, No. E2013-2002-CCA-R3-PC

---

[1]There is no citation available on Westlaw but a copy of our opinion in this case can be found online at http://www.tncourts.gov/sites/default/files/copetracyopn.pdf

(Tenn. Crim. App., at Knoxville, Mar. 10, 2014).

## C. Writ of Error Coram Nobis

In April 2013, one month after the filing of his second petition for post-conviction relief, the Petitioner filed a petition for a writ of error coram nobis. The Petitioner alleged that there was newly discovered evidence in his case. He alleged that the police informed his trial counsel that there was no exculpatory evidence in his case. Police records, however, indicated that Ms. Callahan was working as a paid confidential informant for the State during the time period "associated with the trial process in [the Petitioner's] case." Inclusion of this evidence at trial, he asserts, would have resulted in a different judgment. He notes that there was no evidence introduced at trial that supported Ms. Callahan's aggravated kidnapping allegations other than her own testimony. Had the jury known that she was a paid confidential informant, it "*may have* led to a different result."

The coram nobis court dismissed the petition for a writ of error coram nobis, finding:

(7)     On March 15, 2013, [the] Petitioner filed as Case No. C60,299, a second petition for relief from conviction or sentence. In this second petition for post-conviction relief, the Petitioner alleged that his due process rights under the Tennessee and United States Constitutions were violated by the failure of the State to disclose that one of the victims, Debbie Callahan, had served as a confidential informant for the Kingsport Police Department. [The] Petitioner contended that this failure to disclose would be a violation of Brady v. Maryland, 373 U.S.83 (1963), alleging that the State suppressed evidence which was favorable to the Petitioner and material to the issue of guilt.

(8)     In an Order of Dismissal filed July 30, 2013, the Court dismissed the second petition for relief from sentence or conviction. The Court found that the second petition was filed after the one-year statute of limitations and that the petition was filed in violation of the prohibition against more than one petition for post-conviction relief being filed in any criminal case. The Court, therefore, treated the second petition as a petition to reopen the previously dismissed petition. The Court then reviewed the request under the statutory provision allowing reopening of a post-conviction petition. The Court found that the only provision allowing reopening that might apply in [the] Petitioner's situation was the one in which a court finds by clear and convincing evidence that the facts of the underlying claim were true, a petitioner would be entitled

to have the conviction set aside. The Court found that [the] Petitioner had failed to meet the required standard to reopen and, as a result the second petition for relief from sentence or conviction was dismissed.

(9)     In his Writ, [the] Petitioner raises as newly discovered evidence the same allegation as that raised in the second petition for relief from sentence or conviction; i.e., that the State failed to disclose to [the] Petitioner that one of the victims was serving as a confidential informant for law enforcement at the time she testified at trial and that this failure to disclose was a Brady violation.

(10)    [The] Petitioner claims that this information was discovered in a conversation with a fellow inmate on November 21, 2012. The inmate indicated that Debbie Callahan, one of the victims, was a confidential informant for law enforcement a the time of trial. The allegation is that Ms. Callahan became an informant after the arrest of [the] Petitioner. [The] Petitioner claims that this fact was not disclosed to the Petitioner prior to trial. [The] Petitioner claims that if the jury had been made aware of Ms. Callahan's informant status during her cross examination that fact would have affected the credibility of Ms. Callahan in the eyes of the jury.

(11)    Tennessee law requires that a writ of error coram nobis must be filed within one year of the judgments becoming final. In this case, the judgments became final 30 days after the judgments were filed on July 5, 2007, and the Writ was filed April 15, 2013, some four and one-half years after the statute of limitations had run. However, due process considerations may toll the statute of limitations.

[(12)] [The] Petitioner alleges in his petition that Ms. Callahan told one version of the events to the Petitioner that would tend to exonerate the Petitioner prior to the trial but, after becoming a confidential informant, she testified, under oath, to a more incriminating version at the trial. A review of the trial transcript filed by [the] Petitioner with this most recent filing reveals that during cross examination by [the] Petitioner's attorney, Ms. Callahan was never confronted with the allegation that she had given one version of the incident before trial and another version of the incident at trial.

[(13)] In reviewing the Writ under due process considerations, the Court finds

that the Petitioner's reasoning that cross examining the victim with this information would have somehow resulted in a different verdict is speculative and conclusory, particularly since there is nothing in the trial transcript to suggest that Ms. Callahan was ever questioned about giving two versions of the incident, or that she testified at trial differently from the statement that she gave to law enforcement. As a result, the Petitioner has failed to establish with a reasonable probability that any evidence of Ms. Callahan's alleged confidential informant would even be relevant at trial, much less resulted in a different verdict if admitted. As a result, there is no basis for a tolling of the statue of limitations.

[(14)] Further, even if it was determined that evidence of Ms. Callahan's alleged confidential informant status was relevant, the Petitioner has failed to demonstrate that the failure of the jury to learn of Ms. Callahan's alleged status rendered the verdict unreliable or fundamentally unfair and, as a result would entitle the Petition to a new trial. Tennessee Courts have repeatedly held that newly discovered evidence that "serves no other purpose [than] to contradict or impeach" and would not have affected the outcome of the trial, should not be a basis for a writ of error coram nobis or a motion for a new trial.

It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that the trial court erred when it dismissed his petition for a writ of error coram nobis because: (1) Ms. Callahan provided contradictory testimony; (2) the trial court should have recused itself; (3) the proof presented at his trial was insufficient to support his conviction; (4) the verdict was contrary to the law; (5) the trial court issued improper jury instructions; and (6) his trial unfairly violated his due process rights. The State counters that the Petitioner's claims do not entitle him to relief. We agree with the State.

A writ of error coram nobis is available to a defendant in a criminal prosecution. T.C.A. § 40-26-105(a) (2012). The decision to grant or to deny a petition for the writ of error coram nobis on its merits rests within the sound discretion of the trial court. *State v. Ricky Harris*, 301 S.W.3d 141, 144 (Tenn. 2010) (citing *State v. Vasques*, 221 S.W.3d 514, 527-28 (Tenn. 2007)). Tennessee Code Annotated section 40-26-105(b) provides, in pertinent part:

Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

A writ of error coram nobis is an "extraordinary procedural remedy," filling only a "slight gap into which few cases fall." *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn. 1999); *State v. Workman*, 111 S.W.3d 10, 18 (Tenn. Crim. App. 2002). As previously noted by our Court, "the purpose of this remedy 'is to bring to the attention of the [trial] court some fact unknown to the court, which if known would have resulted in a different judgment.'" *State v. Hart*, 911 S.W.2d 371, 374 (Tenn. Crim. App. 1995) (quoting *State ex rel. Carlson v. State*, 407 S.W.2d 165, 167 (Tenn. 1996)).

To establish that he is entitled to a new trial, the Petitioner must show: (a) the grounds and the nature of the newly discovered evidence, (b) why the admissibility of the newly discovered evidence may have resulted in a different judgment if the evidence had been admitted at the previous trial, (c) that the Petitioner was without fault in failing to present the newly discovered evidence at the appropriate time, and (d) the relief sought. *Hart*, 911 S.W.2d at 374-75. Affidavits should be filed in support of the petition. *Id.* at 375.

The grounds for seeking a petition for writ of error coram nobis are not limited to specific categories, as are the grounds for reopening a post-conviction petition. Coram nobis claims may be based upon any "newly discovered evidence relating to matters litigated at the trial" so long as the petitioner also establishes that the petitioner was "without fault" in failing to present the evidence at the proper time. Coram nobis claims therefore are singularly fact-intensive. Unlike motions to reopen, coram nobis claims are not easily resolved on the face of the petition and often require a hearing.

*Harris v. State*, 102 S.W.3d 587, 592-93 (Tenn. 2003). Similar to habeas corpus hearings, coram nobis evidentiary hearings are not mandated by statute in every case." *Richard Hale Austin v. State*, No. W2005-02591-CCA-R3-CO, 2006 WL 3626332, *6 (Tenn. Crim. App. Dec. 13, 2006). A petition of either type "'may be dismissed without a hearing, and without the appointment of counsel for a hearing'" if the petition does not allege facts showing that the petitioner is entitled to relief. *Id.* (quoting *State ex rel. Edmondson v. Henderson*, 421 S.W.2d 635, 636 (Tenn. 1967)).

Coram nobis claims are subject to a one-year statute of limitations that is computed

from the date the judgment of the trial court becomes final. T.C.A. § 27-7-103 (2009); *State v. Mixon*, 983 S.W.2d 661, 670 (Tenn. 1999). The State bears the burden of raising the bar of the statute of limitations as an affirmative defense. *Harris*, 102 S.W.3d at 593. Due process considerations may toll the statute of limitations applicable to coram nobis petitions. *Workman v. State*, 41 S.W.3d 100, 101 (Tenn. 2001). To determine whether due process requires tolling, a court must weigh the petitioner's interest in obtaining a hearing to present a later-arising ground for relief against the State's interest in preventing stale and groundless claims. *Id*. at 103. In balancing these interests, a court should utilize a three-step analysis:

> (1) determine when the limitations period would normally have begun to run;
>
> (2) determine whether the grounds for relief actually arose after the limitations period would normally have commenced; and
>
> (3) if the grounds are "later-arising," determine if, under the facts of the case, a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim.

*Sands v. State*, 903 S.W.2d 297, 301 (Tenn. 1995). Whether due process requires tolling of the limitations period is a mixed question of law and fact, which this Court reviews de novo with no presumption of correctness. *See Vaughn v. State*, 202 S.W.3d 106, 115 (Tenn.2006).

## A. Notice of Appeal

The State contends that the Petitioner's claim should be dismissed because his notice of appeal was not timely filed. The order summarily dismissing the Petitioner's claim was entered on September 30, 2013. The notice of appeal was filed on November 21, 2013. While the State is correct that the notice was untimely filed, this Court may waive the filing of such document in the interest of justice. *See* Tenn. R. App. P. 4(a). We conclude that the interests of justice require that the Petitioner's claims be addressed on their merit.

## B. Statute of Limitations

In this case, the trial court noted in its order summarily dismissing the Petitioner's claims that the petition was untimely filed, stating:

> Tennessee law requires that a writ of error coram nobis must be filed within one year of the judgments becoming final. In this case, the judgments became final 30 days after the judgments were filed on July 5, 2007, and the Writ was filed April 15, 2013, some four and one-half years after the statute of

limitations had run.

The State raised as an affirmative defense the statute of limitations in the lower court. It argued:

> The statute of limitations for a writ of error coram nobis is one year after the final judgment. Tenn. Code Ann. §27-7-103. The court entered a final judgment on March 19, 2009 and [the] Petitioner did not file his petition until April 15, 2013. [The] Petitioner fails on this claim because the statute of limitations has run by over 4 years. [The] Petitioner's reasoning for tolling the statute of limitations is conclusory and without merit.

We agree with the lower court that the Petitioner's petition was untimely filed. We similarly agree that, under some circumstances, due process considerations require tolling the limitations period, and we now turn to address that issue.

### C. Newly Discovered Evidence

Addressing the due process considerations, the Petitioner states that he was not aware that Ms. Callahan was a state informant until it was revealed to him by another inmate. According to the Petitioner's petition for writ of error coram nobis, on November 12, 2012, another inmate gave him information indicating that Ms. Callahan was working as a confidential informant for the State. He filed his petition approximately five months later. The Petitioner raised as "newly discovered evidence" that Ms. Callahan was working as a confidential informant for the State. Our Supreme Court outlined the procedure that a trial court considering a petition for a writ of error coram nobis is to follow:

> [T]he trial judge must first consider the newly discovered evidence and be "reasonably well satisfied" with its veracity. If the defendant is "without fault" in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence may have led to a different result.

*State v. Vasques*, 221 S.W.3d 514, 527 (Tenn. 2007). In determining whether the new information may have led to a different result, the question before the court is "'whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceeding might have been different.'" *Id.* (quotations omitted). There are, however, limits to the types of evidence that may warrant the issuance of a writ of error coram nobis. *See, e.g., State v. Hart*, 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995). Aside from the fact

that the evidence must be both admissible and material to the issues raised in the petition,

> [a]s a general rule, subsequently or newly discovered evidence which is simply cumulative to other evidence in the record or serves no other purpose than to contradict or impeach the evidence adduced during the course of the trial will not justify the granting of a petition . . . when the evidence . . . would not have resulted in a different judgment.

*Id.* (citations omitted).

We conclude that the Petitioner has not proven that there is a reasonable basis to conclude that, had the jury known that Ms. Callahan was working as a confidential informant at the time of trial, the result of the proceedings would have been different. This evidence could have been used to impeach Ms. Callahan, showing her bias, but it would serve no other purpose. Therefore, the evidence does not justify the grant of the petition. *See id.* The Petitioner's remaining claims do not allege newly discovered evidence and are not proper grounds for a writ of error coram nobis. As such, we conclude that the trial court did not err when it found that due process considerations did not require a tolling of the statute of limitations and dismissed the Petitioner's writ of error coram nobis. The Petitioner is not entitled to relief.

## II. Conclusion

After a thorough review of the record and the applicable law, we affirm the coram nobis court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE